No. 14-2295

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

## SCOTT DAHLSTROM, *et al.*,

Plaintiffs-Appellees,

vs.

## SUN-TIMES MEDIA, LLC,

Defendant-Appellant.

---

Appeal from the United States District Court
For the Northern District of Illinois,
Eastern Division, No. 1:12-cv-00658
The Honorable **Harry D. Leinenweber**, Judge Presiding

---

## BRIEF *AMICUS CURIAE* IN SUPPORT OF
APPELLANT SUN-TIMES MEDIA, LLC AND REVERSAL

---

James A. Klenk
Samuel Fifer
Natalie J. Spears, Counsel of Record
Gregory R. Naron
Kristen C. Rodriguez
DENTONS US LLP
233 South Wacker Drive, Suite 7800
Chicago, IL 60606
(312) 876-8000

Attorneys for *Amici Curiae* Better
Government Association, Chicago
Tribune Company, Gannett Co., Inc.,
Hoosier State Press Association
Foundation, Illinois Broadcasters
Association, Illinois Press Association,
Schurz Communications, Inc., and
Yahoo!, Inc.

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 14-2295

Short Caption: Dahlstrom, et al. v. Sun-Times Media LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information on compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Better Government Association, Chicago Tribune Company, Gannett Co., Inc., The Hoosier State Press Association Foundation, Illinois Press Association, Illinois Broadcasters Association, Schurz Communications, Inc., Yahoo!, Inc.

(2)  The names of all law firms who partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Dentons US LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        Chicago Tribune Company's parent company is Tribune Company.  No other *amici* has a parent company.

    ii)  List any publicly held company that owns 10% or more of the party's or amicus' stock:

        None.

---

Attorney's Signature: /s/ James A. Klenk        Date: July 30, 2014

Attorney's Printed Name: James A. Klenk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes__No **X**

Address: 233 South Wacker Drive, Ste. 7800, Chicago, Illinois 60606

Phone Number: 312-876-8000        Fax Number: 312-876-7934

E-Mail Address: james.klenk@dentons.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 14-2295

Short Caption: Dahlstrom, et al. v. Sun-Times Media LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information on compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

     Better Government Association, Chicago Tribune Company, Gannett Co., Inc., The Hoosier State Press Association Foundation, Illinois Press Association, Illinois Broadcasters Association, Schurz Communications, Inc., Yahoo!, Inc.

(2)   The names of all law firms who partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

     Dentons US LLP

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

     Chicago Tribune Company's parent company is Tribune Company. No other *amici* has a parent company.

   ii)  List any publicly held company that owns 10% or more of the party's or amicus' stock:

     None.

---

Attorney's Signature: /s/ Samuel Fifer        Date: July 30, 2014

Attorney's Printed Name: Samuel Fifer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes\_\_No **X**

Address: 233 South Wacker Drive, Ste. 7800, Chicago, Illinois 60606

Phone Number: 312-876-8000        Fax Number: 312-876-7934

E-Mail Address: samuel.fifer@dentons.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 14-2295

Short Caption: Dahlstrom, et al. v. Sun-Times Media LLC

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information on compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Better Government Association, Chicago Tribune Company, Gannett Co., Inc., The Hoosier State Press Association Foundation, Illinois Press Association, Illinois Broadcasters Association, Schurz Communications, Inc., Yahoo!, Inc.

(2) The names of all law firms who partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Dentons US LLP

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

Chicago Tribune Company's parent company is Tribune Company. No other *amici* has a parent company.

ii) List any publicly held company that owns 10% or more of the party's or amicus' stock:

None.

---

Attorney's Signature: /s/ Natalie J. Spears          Date: July 30, 2014

Attorney's Printed Name: Natalie Spears

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes **X** No__

Address: 233 South Wacker Drive, Ste. 7800, Chicago, Illinois 60606

Phone Number: 312-876-8000          Fax Number: 312-876-7934

E-Mail Address:  natalie.spears@dentons.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 14-2295

Short Caption: <u>Dahlstrom, et al. v. Sun-Times Media LLC</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information on compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Better Government Association, Chicago Tribune Company, Gannett Co., Inc., The Hoosier State Press Association Foundation, Illinois Press Association, Illinois Broadcasters Association, Schurz Communications, Inc., Yahoo!, Inc.

(2) The names of all law firms who partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Dentons US LLP

(3) If the party or amicus is a corporation:

   i) Identify all its parent corporations, if any; and

      Chicago Tribune Company's parent company is Tribune Company. No other *amici* has a parent company.

   ii) List any publicly held company that owns 10% or more of the party's or amicus' stock:

      None.

---

Attorney's Signature: <u>/s/ Gregory R. Naron</u>          Date: July 30, 2014

Attorney's Printed Name: Gregory R. Naron

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes __No **X**

Address: 233 South Wacker Drive, Ste. 7800, Chicago, Illinois 60606

Phone Number: 312-876-8000          Fax Number: 312-876-7934

E-Mail Address: gregory.naron@dentons.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. 14-2295

Short Caption: Dahlstrom, et al. v. Sun-Times Media LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information on compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Better Government Association, Chicago Tribune Company, Gannett Co., Inc., The Hoosier State Press Association Foundation, Illinois Press Association, Illinois Broadcasters Association, Schurz Communications, Inc., Yahoo!, Inc.

(2) The names of all law firms who partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Dentons US LLP

(3) If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

        Chicago Tribune Company's parent company is Tribune Company. No other *amici* has a parent company.

    ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

        None.

---

Attorney's Signature: /s/ Kristen C. Rodriguez        Date: July 30, 2014

Attorney's Printed Name: Kristen C. Rodriguez

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes __ No **X**

Address: 233 South Wacker Drive, Ste. 7800, Chicago, Illinois 60606

Phone Number: 312-876-8000        Fax Number: 312-876-7934

E-Mail Address: kristen.rodriguez@dentons.com

# TABLE OF CONTENTS

STATEMENT PURSUANT TO FED. R. APP. P. 29(c)(5) .......................................... vi

CONCISE STATEMENT OF INTEREST .................................................................. vii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ......................................................................................................... 2

ARGUMENT ............................................................................................................. 5

    A. The District Court's Interpretation of the DPPA Unconstitutionally
       Burdens Journalists' Right to Gather and Publish News in the Public
       Interest ........................................................................................................... 5

    B. The District Court's Interpretation of the DPPA Unconstitutionally
       Punishes the Publication of Truthful Information on Matters of Public
       Concern ......................................................................................................... 11

    C. Construing the DPPA to Protect the "Privacy" of Police Officers
       Involved in Alleged Official Misconduct Cannot Withstand First
       Amendment Scrutiny ................................................................................... 17

    D. Plaintiffs' Use of the DPPA as a Censorship Tool Imposes an
       Unconstitutional Prior Restraint ............................................................... 23

CONCLUSION ......................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Civil Liberties Union v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012), *cert. denied,* 133 S. Ct. 651 (2012) .................*passim*

*Auriemma v. Rice,*
  910 F.2d 1449 (7th Cir. 1990) ................................................................. 12

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) .................................................................... 7, 14, 15

*Camara v. Metro North R.R. Co.,*
  596 F. Supp. 2d 517 (D. Conn. 2009) .................................................... 20

*Cassidy v. Am. Broad. Cos., Inc.,*
  60 Ill. App. 3d 831 (1st Dist. 1978) ...................................................... 21

*Coursey v. Greater Niles Twp. Pub. Corp.,*
  40 Ill. 2d 257 (1968) ................................................................... 20, 21

*Cox Broad. Co. v. Cohn,*
  420 U.S. 469 (1975) ................................................................... viii, 15

*Desnick v. Am. Broad. Cos.,*
  44 F.3d 1345 (7th Cir. 1995) ................................................................. 7

*Fairley v. Andrews,*
  578 F.3d 518 (7th Cir. 2009) ............................................................... 24

*Florida Star v. B.J.F.,*
  491 U.S. 524 (1989) ................................................................*passim*

*Garrison v. Louisiana,*
  379 U.S. 64 (1964) ............................................................................ 14

*Geisburger v. Willuhn,*
  72 Ill. App. 3d 435 (1979) .............................................................. 13, 20

*Haynes v. Alfred A. Knopf, Inc.,*
  8 F.3d 1222 (7th Cir. 1993) ............................................................ 13, 20

*Jones v. United States,*
  529 U.S. 848 (2000) ........................................................................... 4

*Lake v. Neal,*
　　585 F.3d 1059 (7th Cir. 2009) ....................................................... 19, 22

*Landmark Comm'cns, Inc. v. Virginia,*
　　435 U.S. 829 (1978) ...................................................................... 14

*Leathers v. Medlock,*
　　499 U.S. 439 (1991) ........................................................................ 7

*Leopold v. Levin,*
　　45 Ill. 2d 434 (1970) ..................................................................... 13

*Margan v. Niles,*
　　250 F. Supp. 2d 63 (N.D.N.Y. 2003) ........................................... 19

*Meiners v. Moriarity,*
　　563 F.2d 343 (7th Cir. 1977) ........................................................ 21

*NAACP v. Button,*
　　371 U.S. 415 (1963) ...................................................................... 19

*Near v. Minnesota,*
　　283 U.S. 697 (1931) .................................................................. 10, 23

*New York Times Co. v. Sullivan,*
　　376 U.S. 254 (1964) .................................................................. 12, 16

*New York Times Co. v. United States,*
　　403 U.S. 713 (1971) ...................................................... 11, 12, 23, 24

*Oklahoma Publ'g Co. v. District Court,*
　　430 U.S. 308 (1977) .................................................................. 23, 24

*People v. Clark,*
　　2014 IL 115776 ............................................................................... 6

*People v. Jones,*
　　188 Ill. 2d 352 (1999) ................................................................... 18

*People v. Melongo,*
　　2014 IL 114852 ............................................................................... 6

*Reno v. Condon,*
　　528 U.S. 141 (2000) ...................................................................... 17

*Richmond Newsp., Inc. v. Virginia,*
　　448 U.S. 555 (1980) .................................................................... viii

*Senne v. Vill. of Palatine, Ill.*,
    695 F.3d 597 (7th Cir. 2012) ................................................. 4

*Smith v. Daily Mail Publ'g Co.*,
    443 U.S. 97 (1979) ............................................... 6, 7, 14, 18

*Sorrell v. IMS Health Inc.*,
    131 S. Ct. 2653 (2011) ......................................................... 17

*Thornhill v. Alabama*,
    310 U.S. 88 (1940) ............................................................... 14

*United States v. Alvarez*,
    132 S. Ct. 2537 (2012) ......................................................... 16

*United States v. Progressive, Inc.*,
    467 F. Supp. 990 (W.D. Wis. 1979) ...................................... 24

*Weinberg v. City of Chicago*,
    310 F.3d 1029 (7th Cir. 2002) ......................................... 23, 24

*Wisconsin Right To Life, Inc. v. Barland*,
    751 F.3d 804 (7th Cir. 2014) .......................................... 16, 19

**Statutes**

5 ILCS 140/7(1)(c) ..................................................................... 21

Driver Privacy Protection Act, 18 U.S.C. §§ 2721-2725 ....................................*passim*

**Other Authorities**

140 Cong. Rec. H2518-01 (1994) .............................................. 19

Brooke Barnett, *Use of Public Record Databases in Newspaper and
    Television Newsrooms*, 53 Fed. Comm. L.J. 557, 560-61 (2001) ...................... 9, 10

*The Death of David Koschman, Report of the Special Prosecutor,
    available at* https://s3.amazonaws.com/s3.documentcloud.org/
    documents/1012913/feb-4-2014-the-death-of-david-koschman-
    report-of.pdf ....................................................................... 3

Don Thompson, *AP Exclusive: Lawmakers bought cars fixed at
    California taxpayers' expense,* Associated Press (Dec. 5, 2012),
    *available at* http://www.mercurynews.com/california/ci_22131258/
    ap-exclusive-lawmakers-bought-cars-fixed-at-california ........................ 8

FTC, *Individual Reference Services: A Federal Trade Comm'n Report to Congress* (1997), *available at* http://www.ftc.gov/reports/individual-reference-services-report-congress ................................................................... 9, 10

Bob Woodward and Carl Bernstein, *All The President's Men* (Simon & Schuster 2007) (1974) ................................................................................... 8

Restatement (Second) of Torts § 652D (1977) ........................................... 13

Soc'y of Prof. Journalists, Code of Ethics, *available at* http://www.spj.org/ethicscode.asp ....................................................... 11

First Amendment of the United States Constitution ........................................*passim*

## <u>STATEMENT PURSUANT TO FED. R. APP. P. 29(C)(5)</u>

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person, other than the amici curiae, contributed money that was intended to fund preparing or submitting this brief.

Dated:        July 30, 2014

*/s/ Natalie J. Spears*
Natalie J. Spears

## CONCISE STATEMENT OF INTEREST

This brief *amicus curiae* is submitted on behalf of the following representatives of the local and national news media, and non-profit organizations whose mission involves educating the public about government activities and abuses:

- **The Better Government Association ("BGA")**, is a nonpartisan, Illinois non-profit corporation, whose mission is to educate the public about waste, inefficiencies, and corruption in government by acting as a watchdog agency uncovering and exposing questionable government activity; to promote respect for the law; and to support public officials in the rightful performance of their duties. BGA was founded in 1923 to protect the integrity of the political process in Chicago. The submission of this brief was duly authorized by Robert Reed, the BGA's Chief of Investigations.

- **Chicago Tribune Company** publishes the Chicago Tribune, the largest metropolitan daily and Sunday newspaper in Illinois and one of the largest in the United States. The Chicago Tribune has a well-established practice of appearing, on a selective basis, in litigation that substantially affects the news media. The submission of this brief was duly authorized by Karen Flax, its Assistant General Counsel.

- **Gannett Co., Inc.** is an international news and information company that publishes more than 80 daily newspapers in the United States—including USA TODAY and several local newspapers serving communities in this Circuit— which reach more than 10 million readers daily. The submission of this brief was duly authorized by Barbara W. Wall, its Vice President/Senior Associate General Counsel.

- **The Hoosier State Press Association Foundation**, a non-profit entity, is affiliated with the Hoosier State Press Association, which represents 165 Indiana newspapers; it exists to foster public understanding of the role of a free press, enhance the ability of Indiana newspapers to fully educate and inform the public, and to defend First Amendment principles. The submission of this brief was authorized by the Board of Directors of the Hoosier State Press Association Foundation.

- **The Illinois Broadcasters Association ("IBA")** is a statewide trade association of broadcast companies who own and operate radio and television stations across the State of Illinois. IBA Executive Director Dennis Lyle authorized submitting this brief.

- **The Illinois Press Association ("IPA")** is the largest state press organization in the United States; its members include nearly all of the more than 600-plus newspapers in Illinois. The submission of this brief was duly authorized by IPA Executive Director Dennis DeRossett.

- **Schurz Communications, Inc.** is a Mishawaka, Indiana-based nationwide communications company, founded in 1872, which publishes eleven daily and eight weekly newspapers, and owns several television and radio broadcasters. The submission of this brief was duly authorized by Marcia K. Burdick, its Senior Vice President-Electronic Division.

- **Yahoo! Inc.** ("Yahoo!") operates Yahoo News, Yahoo Sports, and Yahoo Finance, whose award-winning journalists produce a variety of original news content, including investigative reporting and feature stories. The submission of this brief was duly authorized by Kristina Dinerman-Cooper, Vice-President and Associate General Counsel, Head of Legal Yahoo! Media, Studios and Commerce.

The interest of these *amici* springs from their concerns regarding the chilling effect of the decision below on the practice of investigative journalism. Plaintiffs' suit would censor and punish, pursuant to a criminal statute, reporting on matters of obvious public interest, at the behest of public officials who are the subject of the reporting. If accepted by this Court, Plaintiffs' position would have a profound, negative impact on the ability of *amici* to do their constitutionally significant jobs— bringing matters of public interest and importance to their readers. *See Richmond Newsp., Inc. v. Virginia*, 448 U.S. 555, 572 (1980); *Cox Broad. Co. v. Cohn*, 420 U.S. 469, 491-92 (1975). *Amici* believe their perspective will assist the Court in understanding the broader implications of the dispute and their specific concerns go beyond the dispute between appellant and appellee, and should be heard.

## **INTRODUCTION**

Sometimes the word "censorship" is bandied about so much that it is in danger of losing all meaning. Then a case like this comes along to remind us what it really looks like.

The news reporting by Defendant Sun-Times Media LLC ("Sun-Times") that is the subject of this lawsuit vividly illustrates the power of investigative journalism—it exposed police favoritism toward a criminal suspect (the nephew of former Chicago Mayor Daley) and led to the appointment of a special prosecutor. The Plaintiffs are Chicago Police Department ("CPD") officers that played a part in these events—namely, they were participants in a questionable lineup that factored into CPD's decision not to charge the well-connected suspect.

Plaintiffs complain specifically of a Sun-Times article that discussed their physical appearances as relevant to the lineup (height, weight, eye and hair color), claiming that this commonplace information—which any citizen could ascertain (and record) from looking at Plaintiffs on the street—was derived from department of motor vehicle ("DMV") records, and that its publication violated the Driver Privacy Protection Act, 18 U.S.C. §§ 2721-2725 ("DPPA"). Plaintiffs' lawsuit seeks not only to punish the Sun-Times' important investigative reporting on potential government misconduct, but to actually restrain the publication of that reporting. A more chilling example of the unconstitutional application of criminal statutory law could hardly be envisioned.

Whatever interests may be served by the DPPA, they have no application here, and cannot, consistent with the First Amendment, be invoked to prevent journalists

from using normal reportorial techniques to gather and truthfully report news and information concerning the operation of government and performance of public duties—matters of indisputable, indeed transcendent, public interest.

## BACKGROUND

Richard Vanecko, a nephew of Chicago's former mayor, struck and killed David Koschman on Rush Street before fleeing the scene. The Sun-Times (along with other news media) ran of a series of investigative reports questioning why the CPD declined to seek charges even after detectives knew Vanecko landed the fatal blow. The CPD defended its failure to act by claiming that eyewitnesses failed to pick Vanecko out of a lineup. After obtaining a photograph of the lineup through FOIA (notwithstanding the CPD's attempt to resist that effort), the Sun-Times published an article, entitled "Daley Nephew Biggest On Scene, Not In Lineup" (the "Lineup Story") reporting that the police officers selected for the unsuccessful lineup— Plaintiffs here—bore unusually close physical resemblances to the suspect. The article showed that officers picked for the lineup were even bigger than the 6'3" Vanecko, and compared the participants' appearances, including ages, height, weight, eye color and hair.

The Sun-Times' investigation—strongly suggesting that CPD had covered for a well-connected criminal suspect—prompted the appointment of a special prosecutor to investigate CPD's handling of the case. (R.9-1 (Ex. A), *In re Appointment Of*

*Special Prosecutor*, No. 2011 Misc. 46 (Cook County Cir. Ct. Apr. 6, 2012).)[1] The special prosecutor's investigative report questioned why CPD even held a lineup in the first place when it already knew that Vanecko had thrown the fatal punch. *The Death of David Koschman, Report of the Special Prosecutor, available at:* https://s3.amazonaws.com/s3.documentcloud.org/documents/1012913/feb-4-2014-the-death-of-david-koschman-report-of.pdf, at 46-47.

Unquestionably, Plaintiffs, acting in their official capacity as police officers, were participants in a matter of paramount interest to the public. Yet, they moved to suppress the Lineup Story. Unsuccessful in Illinois state court (the Circuit Court of Cook County twice refused motions to enjoin the Lineup Story, *see* R.9-1 (Ex. C-D) *Fraternal Order of Police v. Sun-Times Media LLC*, No. 11 CH 40181 (Cir. Ct. of Cook Cnty. 2011)), Plaintiffs pursued a federal theory and forum. They brought a one-count Complaint under the DPPA, contending that some of the descriptive information in the Lineup Story (e.g., height and weight) derived from DMV records. They sought an injunction compelling the Sun-Times to withdraw the Lineup Story and bar future reports, plus unspecified compensatory and punitive damages. (A.032-41, Compl.)

The DPPA's definition of "personal information" does not list the disputed characteristics here—Plaintiffs' height, weight, hair and eye color, and approximate age. 18 U.S.C. § 2725(3). Instead, the Act defines "personal information" as

---

[1] Citations to the Original Electronic Record on Appeal are designated as "R." followed by the district court docket number. Citations to the Sun-Times' Appendix are designated as "A." followed by the page number.

"[i]nformation that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information . . . ." It does *not* include information on "vehicular accidents, driving violations, and driver's status." *Id.* The statute also exempts various categories of otherwise prohibited disclosure based on the identity of the speaker and the use of the information. 18 U.S.C. § 2721(b).

Even though the district court thought Plaintiffs' application of the DPPA was an "awful stretch," it reluctantly concluded that it was compelled by dicta in *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 608 (7th Cir. 2012), to rule that the attributes reported by the Sun-Times constituted "personal information." *Senne* compels no such result, and the simple and correct way for the Court to decide this case is to hold that, on its face, the DPPA does not apply to the information the Sun-Times reported; such a natural and literal statutory construction is not only correct but consistent with the Court's duty to avoid "grave" constitutional questions. *Jones v. United States*, 529 U.S. 848, 857 (2000).

The Sun-Times' brief ably addresses *Senne* and the proper interpretation of the statute's scope. However, in the event the Court holds that Plaintiffs' physical features *do* constitute "personal information," and the First Amendment issues are presented foursquare, *amici* wish to address those issues, and the deleterious consequences that the decision below, if affirmed, would have on their ability to report the news.

- 4 -

# ARGUMENT

The *raison d'etre* of Plaintiffs' lawsuit is to shield the CPD and its officers by censoring news coverage. Plaintiffs invoke the DPPA to prohibit publication or "disclosure" of information, 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title"), and the only injury Plaintiffs attempt to allege arises from the "disclosure" of truthful information in the Lineup Story. Under the First Amendment, the DPPA cannot be used to punish a newspaper or to impose a regime of prior restraint censorship on the continued publication of its investigative journalism. Plaintiffs—Chicago police officers whose actions are at the heart of a controversy involving government abuse—have no basis for asserting any privacy interests in the information they challenge. Plaintiffs' application of the DPPA here flunks any standard of First Amendment scrutiny.

## A. The District Court's Interpretation of the DPPA Unconstitutionally Burdens Journalists' Right to Gather and Publish News in the Public Interest

The court below acknowledged that the "Defendant in this case was gathering news and information for subsequent use in its publication, and that information was related to possible misconduct by government officials." (A.028, Certif. Order.) This Court has expressly recognized that "[g]athering news and information" is "necessarily included within the First Amendment's guarantee of speech and press rights as a corollary" of the right to publish. *Am. Civil Liberties Union v. Alvarez* ("*ACLU*"), 679 F.3d 583, 595 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 651 (2012). "[T]he First Amendment provides at least some degree of protection for gathering

news and information, particularly news and information about the affairs of government." *Id.* at 597. Plaintiffs' application of the DPPA manifestly "interferes with the gathering and dissemination of information about government officials performing their duties," and triggers First Amendment scrutiny. *Id.* at 600 (enjoining enforcement of Illinois eavesdropping statute that criminalized filming of police officers); *cf. People v. Melongo*, 2014 IL 114852; *People v. Clark*, 2014 IL 115776 (striking down same statute as unconstitutional). Accordingly, the district court's conclusion that the DPPA does not burden speech and trigger First Amendment scrutiny is directly contrary to this Court's *ACLU* decision.[2]

Under *ACLU* and the settled principles it rests upon, the First Amendment's protections for newsgathering invalidate any application of the DPPA that unnecessarily restricts access to matters of public concern—including, as here, punishing the press for publishing heights, weights, hair and eye colors, and approximate ages of police officers in an investigative report in which those statistics were directly relevant to actions those officers took in the course of their official duties and were part of a controversy involving alleged abuse of power.

In *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979), the Court held journalists could not constitutionally be punished for violating a statute barring disclosure of the identities of juvenile offenders where, as here, they "relied upon routine newspaper reporting techniques to ascertain the identity of the alleged

---

[2] The court below conceded that there is "a colorable argument" that the DPPA *does* "restrict[] speech, just at a 'different point [] in the speech process.'" (A.027, Certif. Order (quoting *Citizens United v. F.E.C.*, 558 U.S. 310, 336 (2010)).)

assailant." *Id.* at 103. All of the data, the "disclosure" of which Plaintiffs seek to punish, is precisely the type of information that journalists accumulate in the normal course of newsgathering. As the Sun-Times argues, the DPPA should not be interpreted to include such data. But if it is so interpreted, then it is unconstitutional as applied.

A "free press cannot be made to rely solely upon the sufferance of government to supply it with information." *Smith*, 443 U.S. at 104; *see also Bartnicki v. Vopper*, 532 U.S. 514, 528 (2001). Instead, in order to perform its "unique role as a check on government abuse," *Leathers v. Medlock*, 499 U.S. 439, 447 (1991), the press must seek the truth by puzzling together information from a variety of sources, including DMV and other records.

Here, the Sun-Times' "reporting techniques" could not be more "routine" or appropriate—it published truthful information provided by one public body (the Illinois Secretary of State) that concerned the performance of another public body (the CPD). But even where newsworthy information is procured by "surreptitious, confrontational, unscrupulous, and ungentlemanly" means (*Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1355 (7th Cir. 1995); *Florida Star v. B.J.F.*, 491 U.S. 524 (1989) (newspaper obtained name of rape victim from police report inadvertently left in press room)), or it comes in over the transom in questionable fashion (*Bartnicki*, 532 U.S. at 518-19), that does not remove it from the First Amendment's purview. If it did, the Watergate scandal would not have been exposed, the Pentagon Papers

would not have been published, and countless other landmarks of investigative journalism would have never seen the light of day.[3]

Like the Sun-Times, the *amici* herein and other news media routinely rely on DMV and other such records in the course of investigations to expose government corruption and the abuse of governmental power. For example, in 2012, the AP reported that "[n]umerous California lawmakers repaired or upgraded their state-provided vehicles at taxpayers' expense" before that perk ended, then bought those vehicles for personal use; "'[e]ssentially what they did was get all their repairs done on the state's dime before they bought it. . . .'" In breaking this story, the AP "paid for records from the Department of Motor Vehicles to help determine which lawmakers had bought their vehicles." Don Thompson, *AP Exclusive: Lawmakers bought cars fixed at California taxpayers' expense*, Associated Press (Dec. 5, 2012), *available at* http://www.mercurynews.com/california/ci_22131258/ap-exclusive-lawmakers-bought-cars-fixed-at-california (last visited July 29, 2014).

In the debate over the DPPA, "several examples of important stories that resulted from searches of driver's license records" were discussed; *e.g.*,

- A reporter from the Providence Journal used DMV records to identify school bus drivers with dangerous driving records;

---

[3] One of the early breaks in the Watergate investigation came when a Washington Post night police reporter got a friendly officer to let him browse through address books confiscated from the break-in suspects; two of the books contained the notation, "W.H." and "W. House," connected to the name Howard Hunt. Bob Woodward and Carl Bernstein, *All The President's Men*, 22 (Simon & Schuster 2007) (1974).

- A Minnesota news story exposed airline pilots "who, despite losing their driving privileges because of alcohol-related offenses, were still flying planes";

- "The Orlando Sentinel used driver records to locate home addresses for Kennedy Space Center workers who, when interviewed at home and away from watchful eyes, discussed government mistakes that led to the Challenger explosion".

Brooke Barnett, *Use of Public Record Databases in Newspaper and Television Newsrooms*, 53 Fed. Comm. L.J. 557, 560-61 (2001) (citing 139 Cong. Rec. 29,467 (1993) (letter from the Soc'y of Prof'l Journalists); Marilyn Adams & Richard Wallace, *Equal Justice in DUI Cases? It All Depends*, Miami Herald, Oct. 28, 1991; Dan Tracy & Jim Leusner, *Past, Present Workers Attack Safety, Quality Center*, Orlando Sentinel, Feb. 9, 1986).

The federal government itself has acknowledged the utility of such records in the practice of journalism. In 1997, the Federal Trade Commission issued a report to Congress about "individual reference services," or "lookup services," commercial databases that offer "[a] vast amount of information about consumers," including DMV records. *See* FTC, *Individual Reference Services: A Federal Trade Comm'n Report to Congress* (1997), *available at* http://www.ftc.gov/reports/individual-reference-services-report-congress (last visited July 29, 2014). In that report, the FTC commented that these commercial services "play an important role in journalism":

> Journalists use the services to ensure the accuracy of
> their stories, for example, by independently verifying the

> identity of a news subject. The look-up services also
> enable reporters to enhance their stories with background
> information on news subjects, like disaster victims and
> elected officials. Journalists also emphasize the value of
> having access to as much identifying information as
> possible.

*Id.* The FTC report did not recommend to Congress that access to such services

should be limited to "law enforcement-related purposes," or to regulated users like

lawyers, noting that this "would exclude journalistic uses and important industry

uses, like fraud prevention." *Id.*

After conducting a systematic empirical study of how journalists use public

record databases, one commentator concluded that "reporting and developing

socially significant stories depends on access to public records" and restricting that

access, as Plaintiffs would use the DPPA to do,

> not only would some stories prove more difficult or
> expensive to report, or be reported less completely,
> accurately, or quickly, but reporters would miss
> altogether those stories that result from routine searching
> of public records—so-called "enterprise stories." Given
> that enterprise stories often involve politics, government
> abuse, crime, safety violations, and other matters of
> exceptional public importance, the ultimate effect of
> restricting access to public records would impact not only
> journalists, but also the public at large.

Barnett, 53 Fed. Comm. L.J. at 558.

Over 80 years ago, the Supreme Court "emphasize[d] the primary need of a

vigilant and courageous press, especially in great cities," aptly observing that as

"opportunities for malfeasance and corruption have multiplied" in the modern city,

so has the danger that crime will be "protect[ed] by unfaithful officials." *Near v.*

*Minnesota*, 283 U.S. 697, 719-20 (1931). The investigative journalism that Plaintiffs

wish to put on trial in this case does nothing more or less than follow that Supreme Court admonition. It is the quintessential example of what investigative reporting *should* do—exposing favoritism in criminal prosecutions in Chicago, it led to significant, practical results. "[F]ar from deserving condemnation," the newspaper "should be commended for serving the purpose that the Founding Fathers saw so clearly. In revealing the workings of government . . . the newspapers nobly did precisely that which the Founders hoped and trusted they would do." *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).

### B. The District Court's Interpretation of the DPPA Unconstitutionally Punishes the Publication of Truthful Information on Matters of Public Concern

"[P]ublic enlightenment is the forerunner of justice and the foundation of democracy. The duty of the journalist is to further those ends by seeking truth and providing a fair and comprehensive account of events and issues." Soc'y of Prof. Journalists, Code of Ethics, *available at* http://www.spj.org/ethicscode.asp (last visited July 29, 2014). The journalist's role is to "seek truth and report it" (*id.*); hence, their reporting is guided by two basic questions: (1) "is it truthful?"; and (2) "is it newsworthy?"

The reporting here clearly met both of these criteria. If the Sun-Times reported wholly extraneous information only to embarrass or harm Plaintiffs—their Social Security Numbers, for example—then that publication would not be newsworthy (and could potentially be the basis for a civil tort action). That is not the case here. As the court below acknowledged, "unlike with a person's address, phone number, or social security number, it is not clear how revealing a person's height or hair

color threatens that person's safety." (A.025, Certif. Order.) The simple and correct
answer is that it does not.

To the contrary, the nexus between the truthful information reported and the
public's interest could not be more direct: as the court below noted, this is a case
"where a government official's height and weight matter, as they relate to whether
the CPD should have used these officials as fillers alongside Vanecko." (A.028,
Certif. Order.) The Sun-Times' reporting is at the heart of the First Amendment's
protections. "It would be difficult to find a matter of greater public concern in a
large metropolitan area than police protection and public safety." *Auriemma v. Rice*,
910 F.2d 1449, 1460 (7th Cir. 1990). And our "profound national commitment to the
principle that debate on public issues should be uninhibited, robust, and
wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)), leaves no
room for overbroad assertions of "privacy" by government actors:

> The dominant purpose of the First Amendment was to
> prohibit the widespread practice of governmental
> suppression of embarrassing information. . . . Secrecy in
> government is fundamentally anti-democratic,
> perpetuating bureaucratic errors. Open debate and
> discussion of public issues are vital to our national health.

*New York Times v. United States*, 403 U.S. at 723-24 (Douglas, J., concurring).

Significantly, Plaintiffs do not attempt to assert a tort claim for invasion of
privacy—such a claim would be frivolous on its face, not only because Plaintiffs are
public officials with no privacy rights to assert here (*see infra*), but because the
information at issue bears no resemblance to the intrusive, intensely personal, non-
newsworthy facts the disclosure of which could be actionable. As this Court has

held, the privacy tort is concerned with "the protection of those intimate physical

details the publicizing of which would be not merely embarrassing and painful but

deeply shocking to the average person subjected to such exposure." *Haynes v. Alfred

A. Knopf, Inc.*, 8 F.3d 1222, 1234-35 (7th Cir. 1993).

> This form of invasion of privacy requires the information
> disclosed relate to the private, as opposed to the public life
> of the plaintiff, and the name of the plaintiff, in itself,
> does not constitute such an invasion of privacy. As an
> example, there is no liability for publicity given to matters
> of public record such as the date of birth, fact of marriage,
> etc. (See, Restatement (Second) of Torts § 652D (1977).)
> The matter made public must be one which would be
> offensive and objectionable to a reasonable man of
> ordinary sensibilities. (See, Prosser on Torts, § 117 (4th ed.
> 1971).)

*Geisburger v. Willuhn*, 72 Ill. App. 3d 435, 439 (1979). The strict limits on the

common law privacy tort are directly informed by the First Amendment. *See, e.g.,*

Restatement (Second) of Torts, § 652D, com. (d) ("When the subject-matter of the

publicity is of legitimate public concern, there is no invasion of privacy. This has

now a rule not just of the common law of torts, but of the Federal Constitution as

well"); *Leopold v. Levin*, 45 Ill. 2d 434, 442, 444 (1970) (constitutional limits on right

to privacy "protect published materials unless they are 'utterly without redeeming

social value'"; public concern or newsworthiness limitation on privacy claims is

necessary to avoid the serious "question[s] of freedom of expression" such claims

would otherwise raise).

What is true of the common law right to privacy is *a fortiori* true when assessing

the constitutionality of a statute that is being applied to punish and censor speech.

Plainly put, if the DPPA can be used to punish "disclosure" of the truthful, newsworthy facts at issue here then it is unconstitutional.

It is fundamental First Amendment jurisprudence that "[t]ruth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). Freedom of speech and press "embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940); *Smith v. Daily Mail*, 442 U.S. at 102 ("state action to punish the publication of truthful information seldom can satisfy constitutional standards").

The First Amendment protects the press' right to "disclose" truthful information in the public interest. *Bartnicki,* 532 U.S. at 517-18 (Supreme Court "firmly convinced" that press could not be punished under eavesdropping statute for "repeated intentional disclosure of an illegally intercepted" phone conversation "about a public issue," because disclosures were "protected by the First Amendment"). A long line of Supreme Court precedent holds that the press may not constitutionally be punished for publishing truthful information on a matter of public concern. *See, e.g., Florida Star*, 491 U.S.at 535 (First Amendment prevented court from penalizing press for publishing rape victim's name in violation of statute); *Smith v. Daily Mail*, 443 U.S. at 103 (First Amendment prevented penalizing press for violation of statute barring disclosure of juvenile offenders' identities); *Landmark Comm'ns, Inc. v. Virginia*, 435 U.S. 829, 837 (1978) (First

Amendment does not permit punishment of "the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry and Review Commission"); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) (civil damage award against a television station for broadcasting the name of a rape victim in violation of statute held unconstitutional).[4]

The information disclosed in the foregoing cases was obviously far more sensitive and potentially harmful than the truthful statistical information about Plaintiffs' appearances that was "disclosed" in the Lineup Story. There is no comparison. Yet the Supreme Court held those disclosures could not be punished consistent with the First Amendment—because they concerned matters of public interest. *See, e.g., Florida Star*, 491 U.S. at 536-37 (publication of rape victim's name "concerned a 'matter of public significance'"; "the article generally, as opposed to the specific identity contained within it, involved a matter of paramount public import: the commission, and investigation, of a violent crime which had been reported to authorities").

---

[4] The Supreme Court has declined to answer categorically whether truthful information, even if obtained unlawfully, can "ever be punished consistent with the First Amendment"; instead, it "consider[s] whether, given the facts of the[] case[], the interests served by [the challenged statute] can justify its restrictions on speech." *Bartnicki*, 532 U.S. at 529. The Court left no doubt that a statute cannot be enforced in a case like this one, which "implicates the core purposes of the First Amendment because it imposes sanctions on the publication of truthful information of public concern"; in such cases, "privacy concerns give way when balanced against the interest in publishing matters of public importance." *Id.* at 533-34. As discussed *infra*, Plaintiffs' asserted privacy interests are not cognizable, and cannot justify restricting speech. Moreover, here—as in *ACLU*—the Sun-Times' newsgathering broke no generally applicable laws independent of the DPPA provision which is the subject of its constitutional challenge.

Moreover, in this case, the First Amendment injury is compounded by the fact that Plaintiffs' expansive interpretation of the statute would compel citizens and journalists alike to guess at what the statute covers. As this Court recently emphasized, the First Amendment requires "a higher standard of clarity and precision," in order to "'ensure that ambiguity does not chill protected speech.' Vague or overbroad speech regulations carry an unacceptable risk that speakers will self-censor, so the First Amendment requires more vigorous judicial scrutiny." *Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014) (internal citation omitted). That risk is starkly presented here: no reporter (and frankly, few lawyers) would reckon that the DPPA's definition of "personal information" was broader than expressly stated, and sweepingly barred the "disclosure" of merely descriptive physical attributes found on a driver's license, which could in no sense be considered private.

In short, punishing the news media for obtaining, disclosing and publishing truthful, readily apparent information, concerning Plaintiffs' role in alleged government misconduct, is fundamentally incompatible with the First Amendment. The notion that journalists may be punished for accurately reporting about newsworthy events is the very definition of "chilling." *New York Times v. Sullivan*, 376 U.S. at 278-79; *see also id.* at 299-301 (Goldberg, J., concurring); *United States v. Alvarez*, 132 S. Ct. 2537, 2548 (2012).

### C. Construing the DPPA to Protect the "Privacy" of Police Officers Involved in Alleged Official Misconduct Cannot Withstand First Amendment Scrutiny

To paraphrase *ACLU*, "[a]s applied here," the DPPA "interferes with the gathering and dissemination of information about government officials performing their duties," and "[a]ny way you look at it, the [DPPA] burdens speech and press rights and is subject to heightened First Amendment scrutiny." 679 F.3d at 600.

A statute that discriminates among speakers and the content of their speech is subject to strict scrutiny under the First Amendment. *See id.* at 604 (citing *Citizens United v. F.E.C.*, 558 U.S. 310, 339 (2010); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 659 (1994)).[5] That is precisely what the DPPA does. *See* 18 U.S.C. § 2721(b) (exempting fourteen categories of otherwise prohibited disclosure based on speaker's identity and how information is used). "The DPPA permits DMVs to disclose personal information from motor vehicle records for a number of purposes" and "allows private persons who have obtained drivers' personal information for one of the aforementioned permissible purposes to further disclose that information for any one of those purposes"; "The motor vehicle information which the States have historically sold is used by insurers, manufacturers, direct marketers, and others." *Reno v. Condon*, 528 U.S. 141, 145-46, 148 (2000).

Indeed, privileging these commercial uses of "personal information" but prohibiting news reporting "inverts the recognized positions of commercial and

---

[5] *See also Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663 (2011) (legislation was content-based restriction violating First Amendment where it "disfavors specific speakers, namely pharmaceutical manufacturers").

noncommercial speech in first amendment jurisprudence." *People v. Jones*, 188 Ill. 2d 352, 362-64 (1999) (holding Illinois sound amplification statute was content-based despite content-neutral intent). But "[e]ven under the more lenient intermediate standard of scrutiny applicable to content-neutral burdens on speech," the statute's application cannot be sustained. *ACLU,* 679 F.3d at 586 (declining to determine whether strict scrutiny applied, where statute unconstitutional under intermediate scrutiny in any event).[6]

The construction of the DPPA advocated by Plaintiffs and adopted below cannot withstand *any* level of First Amendment scrutiny. "When a state attempts to punish publication after the event it must . . . demonstrate that its punitive action was necessary to further the state interests asserted." *Smith*, 443 U.S. at 102. And where it is truthful information "about a matter of public significance," then publication may not be punished absent a state interest "of the highest order." *Id.* at 103; *Florida Star*, 491 U.S. at 537-41 (state interests said to be served by Florida statute—protection of the privacy and physical safety of rape victims, and encouragement of victims to report such crimes—were not of such magnitude to trump the First Amendment).

A narrow fit between means and ends is always critical in the First Amendment context, where "[p]recision of regulation must be the touchstone" and "[b]road

---

[6] Intermediate scrutiny requires "an important public-interest justification for the challenged regulation," and "that the burden on First Amendment rights must not be greater than necessary to further the important governmental interest at stake." *Id.* at 605.

prophylactic rules" are "suspect." *NAACP v. Button*, 371 U.S. 415, 433, 438 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."); *Wisconsin Right To Life*, 751 F.3d at 835. Such a fit is even more important in a case like this one, where a restriction on speech not only deprives the speaker of important First Amendment rights, but also deprives the public of valuable information on matters of great concern. *ACLU*, 679 F.3d at 597 (First Amendment's reach "goes beyond protection of the press and self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw").

The DPPA was enacted as part of the Violent Crime Control and Law Enforcement Act of 1994. *See* 18 U.S.C. §§ 2721-25. It was prompted by reports that stalkers had obtained victims' home addresses from motor vehicle records. 140 Cong. Rec. H2518-01, H2527 (1994) (statement of Rep. Goss); *see also Lake v. Neal*, 585 F.3d 1059, 1060-61 (7th Cir. 2009) (noting DPPA was prompted in part by the murder of actress Rebecca Schaeffer by a stalker).

Here, Plaintiffs' proposed restriction on disclosure of the information at issue does not advance the specific public safety interests that are the subject of the DPPA—it is not personal information that could be used to facilitate stalking. "[T]he DPPA was a crime fighting measure; not a general privacy protection measure." *Margan v. Niles*, 250 F. Supp. 2d 63, 69 n.4 (N.D.N.Y. 2003). Significantly, the DPPA's definition of "personal information" includes an individual's address—unique to his or her household—but specifically excludes zip

codes, which are common to many. This distinction demonstrates Congress did not irrationally intend the DPPA to indiscriminately sweep in descriptive attributes, such as brown eyes or hair. *See Camara v. Metro North R.R. Co.*, 596 F. Supp. 2d 517 n.9 (D. Conn. 2009) (construing DPPA to find that birth dates are not "personal information").

Nor does Plaintiffs' sweeping (and extra-statutory) interpretation of "personal information" advance even generalized privacy concerns. *See Haynes v. Alfred A. Knopf,* 8 F.3d at 1229; *Geisburger v. Willuhn,* 72 Ill. App. 3d at 439. Indeed, Plaintiffs' general height, weight, hair and eye color, are apparent just by looking at them on the street, and these "disclosures" are reflected in the lineup photo, which is already in the public domain.

In any event, construing the Act to cover such commonplace, non-intrusive data points in this context serves no interest underlying the DPPA, and clearly restricts more speech than necessary "to protect legitimate privacy interests." *ACLU*, 679 F.3d at 586. The fact is, police officers *do not have* a "legitimate privacy interest" as to matters in the line of duty.

Whether it is wanted or not, scrutiny "comes with the territory" of being a public law enforcement official. As the Illinois Supreme Court has held, even though a patrolman "is 'the lowest in rank of police officials' and would have slight voice in setting departmental policies, his duties are peculiarly 'governmental' in character and highly charged with the public interest." *Coursey v. Greater Niles Twp. Pub. Corp.*, 40 Ill. 2d 257, 265 (1968). If anything,

> the public has a far greater interest in the qualifications
> and conduct of law enforcement officers, even at, and
> perhaps especially at, an "on the street" level than in the
> qualifications and conduct of other comparably low-
> ranking government employees performing more
> proprietary functions. The abuse of a patrolman's office
> can have great potentiality for social harm. . . .

*Id.*; *see also Meiners v. Moriarity*, 563 F.2d 343, 352 (7th Cir. 1977) (emphasizing

the direct public interest in performance of federal agents "whose decisions to

search and to arrest directly and personally affect individual freedoms").[7]

Thus, "the conduct of a policeman on duty is legitimately and necessarily an area

upon which public interest may and should be focused," *Cassidy v. Am. Broad. Cos.,

Inc.*, 60 Ill. App. 3d 831, 839 (1st Dist. 1978), and information bearing on

performance of police officers' official duties *cannot* be the basis for an "invasion of

privacy": "*[N]o right of privacy against intrusion can be said to exist with reference to

the gathering and dissemination of news concerning discharge of public duties.*" *Id.*

at 838 (police officer could not sue news organization for invasion of privacy for

taping officer's undercover activities at a massage parlor; "plaintiff was not a

private citizen engaged in conduct which pertained only to himself") (emphasis

added); *see also* 5 ILCS 140/7(1)(c) ("invasion of privacy" exemption of Illinois FOIA

stipulates that "[t]he disclosure of information that bears on the public duties of

public employees and officials shall not be considered an invasion of personal

privacy").

---

[7] Plaintiffs are "beat" patrol officers; no claim has been or could be made that they
were working in an undercover or "special operations" capacity where their
identities would need to be maintained as secret.

Additionally, as interpreted by the district court, the DPPA burdens more speech than necessary to further the asserted governmental interest for another reason. "The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination. *Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts.*" *Florida Star*, 491 U.S. at 534 (emphasis added).

Here, the DPPA provides that a "State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity . . . personal information, as defined in 18 U.S.C. § 2725(3), about any individual obtained by the department in connection with a motor vehicle record. . . ." 18 U.S.C. § 2721(a)(1); *Lake v. Neal*, 585 F.3d at 1060 ("The DPPA regulates the ways a DMV can disclose information"). Hence, construing 18 U.S.C. § 2722(a) to punish the press for receiving and publishing information entrusted to the government cannot withstand First Amendment scrutiny, because there is "a less drastic means than punishing truthful publication . . . for guarding against the dissemination of private facts" (of which there are none here)—namely, recourse against the government entity entrusted with the information. *Florida Star*, 491 U.S. at 534.

**D. Plaintiffs' Use of the DPPA as a Censorship Tool Imposes an Unconstitutional Prior Restraint**

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. at 714 (newspaper's right to publish Pentagon Papers). An injunction against "further publication" of news is "of the essence of censorship." *Near*, 283 U.S. at 713. The injunction Plaintiffs seek in their Complaint—to remove news from Sun-Times' websites and censor its further publication—is an unlawful prior restraint under the First Amendment. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045-46 (7th Cir. 2002) (license ordinance violated First Amendment by impairing ongoing distribution and sale of book); *Oklahoma Publ'g Co. v. District Court*, 430 U.S. 308 (1977) (striking down injunction prohibiting news media from publishing the name or photograph of juvenile obtained by reporters who were admitted to closed hearing in violation of state statute; held, once the truthful information was "publicly revealed" or "in the public domain" court could not constitutionally restrain its dissemination).

The court below ruled that judicial censorship of the Sun-Times website would pass muster if it only halted "continuing publication" of speech "that has already taken place." (A.015, Const. Order.) However, under *Near*, if a "publisher has a constitutional right to publish, without previous restraint, an edition of his newspaper charging official derelictions, it cannot be denied that he may publish subsequent editions for the same purpose. He does not lose his right by exercising it." 283 U.S. at 720. This Court also characterized laws that restrict distribution of

published materials as "prior restraints [that] are highly disfavored and presumed invalid." *Weinberg*, 310 F.3d at 1045-46 (peddling ordinance that restricted continued book sales).

Public officials' after-the-fact attempt to clamp down on uncomfortable truths is a "quintessential first-amendment violation." *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009); *Oklahoma Publ'g Co.*, 430 U.S. 308. If the Pentagon Papers, the plans for an atomic bomb, and other information that arguably posed a threat to national security and public safety could not constitutionally be censored, *see New York Times v. United States,* 403 U.S. at 714; *United States v. Progressive, Inc.*, 467 F. Supp. 990 (W.D. Wis. 1979), then there is no conceivable basis for permitting a censor's veto to be wielded by the very officers whose role in alleged government misconduct was exposed by the reporting here.

## <u>CONCLUSION</u>

For the foregoing reasons, *amici curiae* respectfully suggest that the Court reverse the decision below.

Dated:        July 30, 2014            Respectfully submitted,

                                       By:    */s/ Natalie J. Spears*
                                              One of the Attorneys for *Amici Curiae*
                                              Better Government Ass'n, Chicago
                                              Tribune Company, Gannett Co., Inc.,
                                              Hoosier State Press Ass'n Foundation,
                                              Illinois Broadcasters Ass'n, Illinois
                                              Press Ass'n, Schurz Communications,
                                              Inc., and Yahoo!, Inc.

James A. Klenk
Samuel Fifer
Natalie J. Spears
Gregory R. Naron
Kristen C. Rodriguez
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606
(312) 876-3114

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, <u>TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 6,882 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the word count feature of Microsoft® Word.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as modified by Circuit Rule 32(b) because this brief has been prepared using Microsoft® Word with Century Schoolbook font, which is a proportionally spaced typeface, and using 12 pt. font in the body of the text and 12 pt. font in footnotes.

Dated: July 30, 2014

*/s/ Natalie J. Spears*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2014, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Natalie J. Spears*

82556773\V-18