**No. 14-2295**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

SCOTT DAHLSTROM, HUGH GALLAGLY, PETER KELLY
ROBERT SHEA, and EMMET WELCH,

Plaintiffs and Appellees,

vs.

SUN-TIMES MEDIA, LLC,

Defendant and Appellant.

Appeal from the United States District Court
For the Northern District of Illinois,
Eastern Division, No. 1:12-cv-00658
The Honorable **Harry D. Leinenweber**, Judge Presiding

### REPLY BRIEF OF DEFENDANT-APPELLANT
### SUN-TIMES MEDIA, LLC

Damon E. Dunn, Esq. (#06180629)
Seth A. Stern, Esq. (#6300954)
**FUNKHOUSER VEGOSEN LIEBMAN & DUNN LTD.**
55 West Monroe Street, Suite 2300
Chicago, Illinois 60603
Telephone:  (312) 701-6800
Facsimile:  (312) 701-6801
*Attorneys for Sun-Times Media, LLC*

# TABLE OF CONTENTS

**Page**

ARGUMENT ............................................................................................................... 1

I.     A Natural Construction of the DPPA Permits the Sun-Times' Reporting ............ 4

       A.     Plaintiffs' Construction Renders the DPPA Impermissibly Vague ........... 5

       B.     If the Sun-Times Published "Personal Information"
              the Reporting was a "Permissible Use" ................................................. 11

       C.     The Court Should Construe the DPPA to Avoid Conflict
              with the First Amendment ...................................................................... 12

II.    Plaintiff's Construction of the DPPA Would Render It Unconstitutional ........... 14

       A.     The Sun-Times Reported on Fundamental Matters of
              Public Concern ....................................................................................... 14

       B.     The First Amendments Rights to Both Access and
              Publication Forbid Plaintiffs' Proposed Application of the DPPA ........ 16

       C.     The Proposed Application of the DPPA Cannot Withstand any Level of
              Constitutional Scrutiny ........................................................................... 19

III.   Plaintiffs' Proposed Injunctive Relief is the Essence of Censorship ................. 22

CONCLUSION ...................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Admiral Theatre v. City of Chicago*,
    832 F. Supp. 1195 (N.D. Ill. 1993) ................................................................23

*American Civil Liberties Union of Ill. v. Alvarez ("ACLU")*,
    679 F.3d 583 (7th Cir. 2012) ...................................................................passim

*Ampersand Publ'g, LLC v. NLRB*,
    702 F.3d 51 (D.C. Cir. 2012) ....................................................................15

*Auriemma v. Rice*,
    910 F.2d 1449 (7th Cir. 1990) ..................................................................11

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)..........................................................................18, 21

*Better Gov't Ass'n v. Blagojevich*,
    386 Ill. App. 3d 808 (4th Dist. 2008) ..........................................................1

*Buckley v. Valeo*,
    424 U.S. 1 (1976)..................................................................................6

*Clark v. Martinez*,
    543 U.S. 371 (2005)............................................................................13

*Cohen v. California*,
    403 U.S. 15 (1971)..............................................................................14

*Concerned Citizens for Judicial Fairness, Inc. v. Yacucci*,
    No. 4D14-2971, 2014 WL 4327916 (Fla. Dist. Ct. App. Sept. 3, 2014) ...........23

*Cox Broad. Corp. v. Cohn*,
    420 U.S. 469 (1975)............................................................................17

*Desnick v. Am. Broad. Cos.*,
    44 F.3d 1345 (7th Cir. 1995) ..................................................................18

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988)........................................................................12, 13

*Edwardsville Nat'l Bank & Trust Co. v. Marion Labs., Inc.*,
    808 F.2d 648 (7th Cir. 1987) ..................................................................22

*Fairley v. Andrews*,
    578 F.3d 518 (7th Cir. 2009) ..................................................................23

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978)............................................................................17

*Foster v. State of Indiana*,
    813 N.E.2d 1236 (Ind. Ct. App. 2004)..........................................................2

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991)..........................................................................3, 5

*Gertz v. Robert Welch, Inc.,*
418 U.S. 323 (1974) ............................................................................................... 15

*Howard v. Criminal Info. Servs.,*
654 F.3d 887 (9th Cir. 2011) ............................................................................... 19

*Hynes v. Mayor & Council of Borough of Oradell,*
425 U.S. 610 (1976) ................................................................................................. 6

*In re Globe Bldg. Materials, Inc.,*
463 F.3d 631 (7th Cir. 2006) ................................................................................. 5

*Jones v. United States,*
529 U.S. 848 (2000) ............................................................................................... 13

*Landmark Commc'ns, Inc. v. Virginia,*
435 U.S. 829 (1978) ............................................................................................... 17

*Leonardini v. Shell Oil Co.,*
216 Cal. App. 3d 547 (Cal. Ct. App. 1989) ....................................................... 23

*Martin v. City of Struthers, Ohio,*
319 U.S. 141 (1943) ............................................................................................... 17

*Mattivi v. Russell,*
No. CIV.A. 01-WM-533(BNB, 2002 WL 31949898 (D. Colo. Aug. 2, 2002) ................................ 12

*McCullen v. Coakley,*
134 S. Ct. 2518 (2014) ............................................................................................. 4

*Miami Herald Publ'g Co. v. Tornillo,*
418 U.S. 241 (1974) ............................................................................................... 15

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,*
460 U.S. 575 (1983) ............................................................................................... 20

*Nat'l Ass'n Of Criminal Def. Lawyers v. Chicago Police Dept.,*
399 Ill. App. 3d 1 (1st Dist. 2010) ....................................................................... 9

*Near v. State of Minn. ex rel. Olson,*
283 U.S. 697 (1931) ................................................................................................. 4

*Nelson v. Jesson,*
CIV. 13-340 RHK/JJK, 2013 WL 5888235 (D. Minn. Nov. 1, 2013) .............. 21

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964) ............................................................................................... 14

*New York Times Co. v. United States,*
403 U.S. 713 (1971) ................................................................................. 10, 21, 22

*Oklahoma Publ'g Co. v. Dist. Ct. In & For Okla. Cnty.,*
430 U.S. 308 (1977) ......................................................................................... 17, 23

*People v. Gaytan,*
2013 IL App (4th) 120217 ....................................................................................... 6

*People v. Jones,*
188 Ill. 2d 352 (1999) ........................................................................................... 19

*People v. Melongo,*
2014 IL 114852 .................................................................................................. 22

*Reed v. Nw. Publ'g Co.,*
124 Ill. 2d 495 (1988) ...................................................................................... 14

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979) ............................................................................................ 2

*Reno v. Condon,*
528 U.S. 141 (2000) ............................................................................................ 7

*Sable Commc'ns of Cal. v. FCC,*
492 U.S. 115 (1989) .......................................................................................... 20

*Senne v. Village of Palatine, Ill.,*
695 F.3d 597 (7th Cir. 2012) ............................................................................ 5

*Shefcik v. Vill. of Calumet Park,*
532 F. Supp. 2d 965 (N.D. Ill. 2007) .......................................................... 11

*Skilling v. United States,*
561 U.S. 358 (2010) ................................................................................ 2, 6, 10

*Smith v. City of Cumming,*
212 F.3d 1332 (11th Cir. 2000) .................................................................... 18

*Smith v. Goguen,*
415 U.S. 566 (1974) ............................................................................................ 5

*Smith v. People of the State of Cal.,*
361 U.S. 147 (1959) .......................................................................................... 14

*Snyder v. Phelps,*
131 S. Ct. 1207 (2011) ................................................................................ 14, 15

*Sorrell v. IMS Health,*
131 S. Ct. 2653 (2011) ...................................................................................... 20

*Stanley v. Georgia,*
394 U.S. 557 (1969) .......................................................................................... 17

*Taylor v. Acxiom Corp.,*
612 F.3d 325 (5th Cir. 2010) .......................................................................... 19

*The Florida Star v. B.J.F.,*
491 U.S. 524 (1989) .................................................................................... 16, 21

*Travis v. Reno,*
163 F.3d 1000 (7th Cir. 1998) ........................................................................ 16

*United States v. Harris,*
177 U.S. 305 (1900) ............................................................................................ 6

*United States v. Miller,*
425 U.S. 435 (1976) .......................................................................................... 21

*United States v. Security Mgmt. Co., Inc.,*
96 F.3d 260 (7th Cir. 1996) ............................................................................. 6

iii

*United States v. Stevens,*
    559 U.S. 460 (2010)................................................................................20
*United States v. Wiltberger,*
    18 U.S. 76 (1820) ...........................................................................6, 10
*United States v. X-Citement Video, Inc.,*
    513 U.S. 64 (1994)................................................................................13
*Weinberg v. City of Chicago,*
    310 F.3d 1029 (7th Cir. 2002) ......................................................18, 23
*Williams v. United States,*
    458 U.S. 279 (1982)........................................................................6, 10
*Wisconsin Right to Life, Inc. v. Barland,*
    751 F.3d 804 (7th Cir. 2014) ........................................................2, 7, 9
*Zadvydas v. Davis,*
    533 U.S. 678 (2001)..............................................................................13

## Statutes

Driver's Privacy Protection Act of 1994, 18 U.S.C. § 2721 *et seq.*..............................................passim
    18 U.S.C. § 2721 ...............................................................................3, 11
    18 U.S.C. § 2724 .....................................................................................10
    18 U.S.C. § 2725 ...............................................................................1, 4, 8
625 ILCS 5/2-123(f-5)(12) ........................................................................12
735 ILCS 110/5 ...........................................................................................11

## United States Constitution

United States Const. amend. I ..............................................................passim

## Other Authorities

Ill. Const. art. I, § 4 ....................................................................................11
Lewis Carroll, *Through the Looking Glass* (1871) ........................................3
*Protecting Driver Privacy: Testimony of Donald L. Cahill Before the Subcomm. on Civil and*
    *Constitutional Rights of the House Comm. on the Judiciary*, 1994 WL 212833 (Feb. 3, 1994)
    (statement of Donald L. Cahill, Fraternal Order of Police) ...........................9

iv

# ARGUMENT

It is "not surpris[ing] that governmental entities . . . generally prefer not to reveal their activities to the public." *Better Gov't Ass'n v. Blagojevich*, 386 Ill. App. 3d 808, 818 (4th Dist. 2008).  Neither the Plaintiff police officers' nor the government's briefs (collectively, the "Response Briefs"), however, can answer the fundamental question at the center of this interlocutory appeal:  how a reporter reading the Driver Privacy Protection Act ("DPPA") could intuit that the DPPA's definition of "personal information" extends to ages, heights, and hair and eye colors, when the DPPA does not say so.  18 U.S.C. § 2725(3).

Instead, the government points to other statutes, which define "personal information" for other purposes, while eliding that none of those definitions include ages, weights, heights, hair and eye colors in their definitions either.  Thus, even a reporter who both read the DPPA *and* searched for guidance elsewhere – more effort than any citizen need undertake to determine the contours of a criminal statute – still would have no way of knowing that he could be held criminally and civilly liable for printing a public official's hair color alongside a lawfully obtained photograph in a news report on a politically charged homicide investigation.

The Response Briefs justify their elastic interpretation of § 2725(3) – which expressly limits itself to information that "identifies an individual" – by suggesting that the word "including" expands the enumerated categories of "personal information" to sweep in any information that could conceivably "describe" an individual.  In a recent First Amendment case, however, this Court found a statute was unconstitutionally

overbroad precisely because the phrase "including, but not limited to" preceded a non-exhaustive list. *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014) ("The 'not limited to' language holds the potential for regulatory mischief.").[1] *Cf. Skilling v. United States*, 561 U.S. 358, 408-09 (2010) (saving 18 U.S.C. 1346 "honest services" fraud statute from unconstitutional vagueness by confining definition to cover only bribery and kickbacks); *Foster v. State of Indiana*, 813 N.E.2d 1236, 1239 (Ind. Ct. App. 2004) (definition of "sexually explicit material" as "including: books, magazines, computer images, internet files, photographs, VCR cassettes, film or other materials" was impermissibly vague) (internal citations omitted).

Moreover, the Response Briefs cannot decide on a common thread binding the enumerated and non-enumerated characteristics they would read the DPPA to cover, thus impliedly conceding that § 2725(3) is unworkable as an illustrative definition. The government's suggested "more general" meaning for "identifies an individual" (p. 9) contains no limiting principle for what, if anything, would *not* constitute "personal information" under the DPPA. Cf. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("[i]n construing a statute we are obliged to give effect, if possible, to every word Congress used"); *Foster*, 813 N.E.2d at 1239 (the "purported specificity in this case, if less inclusive at all than the blanket prohibition against 'pornographic or sexually explicit materials,' is only slightly so") (internal citations omitted). The government, unlike Humpty

---

[1] Even though *Wisconsin Right to Life* involved the constitutionality of a state rather than federal statute, the Court was able to narrow its parameter to conform with First Amendment precedents rather than striking it down.

2

Dumpty, cannot excuse such ambiguities by proclaiming that its words "mean[] just what I choose it to mean."  Lewis Carroll, *Through the Looking Glass* (1871).

The Response Briefs also do not explain how the Constitution could tolerate public officials punishing the press for publishing matters of public concern and particularly when no law expressly forbids it.  *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991) (holding rule restricting attorney speech void for vagueness because attorneys "must guess at its contours").  Nor can they identify a substantial harm that the DPPA, as they interpret it, is narrowly tailored to prevent.

Both Response Briefs attempt to segregate restrictions on access to information from restrictions on publication even after the District Court reversed course and acknowledged that First Amendment jurisprudence makes no such distinction (A 029), citing *American Civil Liberties Union of Ill. v. Alvarez ("ACLU")*, 679 F.3d 583, 586-87 (7th Cir. 2012) (right to obtain information "is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the" information).  In any case, the police officers seek damages for the Sun-Times reporting the color of their hair, not against the Secretary of State for divulging it.

In this context, debate over the appropriate level of Constitutional scrutiny is immaterial because Plaintiffs' interpretation of the DPPA can withstand none.  Contrary to the Response Briefs, the DPPA is not shielded from constitutional scrutiny as a statute of general applicability because (1) it is not generally applicable when it penalizes news reporting while exempting other uses (18 U.S.C. § 2721(b)), and (2) even

3

statutes of general applicability that chill constitutionally protected press freedoms must be narrowly tailored to serve a substantial government interest.  See, *e.g.,* *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (content-neutral statute prohibiting standing on a public way within 35 feet of an abortion clinic violated free speech guarantees "even though the Act says nothing about speech on its face" and only restricted access to public *fora*).

Finally, Plaintiffs' argument that their requested injunction would censor only continuing publication is a non-starter.  They offer no coherent response to the Supreme Court's pronouncement that if a publisher "has a constitutional right to publish, without previous restraint, an edition of his newspaper charging official derelictions, it cannot be denied that he may publish subsequent editions for the same purpose. He does not lose his right by exercising it." *Near v. State of Minn. ex rel. Olson*, 283 U.S. 697, 720 (1931).

I.      **A Natural Construction of the DPPA Permits the Sun-Times' Reporting**

The DPPA defines "Personal Information" as:

> **[I]nformation that identifies an individual**, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

18 U.S.C. § 2725(3) (emphasis added).  It says nothing about hair and eye color, weights, heights, and approximate ages – the only information the Secretary of State allegedly provided for the Lineup Story.  R. Doc. 4-1, p. 6.  The District Court consequently found

that these un-enumerated descriptive traits do not "identif[y] an individual" and that the Sun-Times' report did not threaten Plaintiffs' safety. A 025.

It is evident that, but for *dicta* in *Senne v. Village of Palatine, Ill.*, 695 F.3d 597 (7th Cir. 2012), the District Court would have dismissed this case on statutory construction grounds alone. Critically, neither Plaintiffs nor the government argue that the definition of "personal information" was before the *Senne* court when it undertook to describe the parking citation at issue. Indeed, they cannot identify *any* case where a court actually examined § 2725(3)'s parameters to hold that they encompass the descriptive traits at issue here. Instead, they scramble to concoct justifications for expanding § 2725(3) that the District Court never accepted.

Ultimately, these expansive constructions place Plaintiffs between a rock and a hard place. Either § 2725(3) does not extend to un-enumerated traits, and particularly those that do not "identif[y] an individual," or the newly mutable definition is void for vagueness because it leaves reporters to "guess at its contours." *Gentile,* 501 U.S. at 1048; *cf. In re Globe Bldg. Materials, Inc.*, 463 F.3d 631, 635 (7th Cir. 2006) ("[i]n interpreting the statute we will not invent missing language.").

### A. Plaintiffs' Construction Renders the DPPA Impermissibly Vague

The government tries to evade Plaintiffs' dilemma by ignoring the void for vagueness doctrine – and particularly *Wisconsin Right to Life*, which forbids it from interpreting the word "including" to generate an amorphous list of offenses. *See also Smith v. Goguen*, 415 U.S. 566, 574 (1974) (internal citations omitted) ("Due process requires that all be informed as to what the State commands or forbids, and that men of

5

common intelligence not be forced to guess at the meaning of the criminal law.").  If the DPPA's insertion of "including" is permitted at all under this doctrine, then it must at least be confined to such information that "identifies an individual" and is "of the same type or nature as those specifically enumerated."  *United States v. Sec. Mgmt. Co., Inc.*, 96 F.3d 260, 265 (7th Cir. 1996) (internal citations omitted) (applying doctrine of *ejusdem generis*); *People v. Gaytan*, 2013 IL App (4th) 120217, ¶¶ 35, 40.

Plaintiffs' only answer to *Wisconsin Right to Life* is to restrict its reach to those campaign finance laws subject to *Buckley v. Valeo*, 424 U.S. 1 (1976). The void for vagueness and overbreadth doctrines, as well as the canons of *ejusdem generis* and *expressio unius est exclusio alterius*, are not limited to campaign finance laws.  Rather, these doctrines apply "with particular force" in cases, like this one and *Wisconsin Right to Life*, which invoke the First Amendment.  *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976); *cf. Skilling*, 561 U.S. at 408-09.

Again, the District Court correctly found the DPPA is susceptible to "subjective and variable understandings." *Williams v. United States*, 458 U.S. 279, 286 (1982) (argument that statute penalizing "false statements" in loan and credit applications encompassed bad checks "slights the wording of the statute," despite "plausible" argument that checks were false representations of account balances); A 025.  As such, it cannot be enforced against defendants whose alleged conduct is not "not named or distinctly described."  *United States v. Harris*, 177 U.S. 305, 309-10 (1900).  This basic rule of statutory construction is "not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. 76, 95 (1820) (Marshall, J.) ("It would be dangerous, indeed, to carry

the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute because it is of equal atrocity, or of a kindred character, with those which are enumerated.").[2]  Rather than permitting nebulous civil and criminal liability, the Court should, as in *Wisconsin Right to Life*, construe the definition narrowly by limiting it to enumerated categories of "personal information" or at most "functional[ly] equivalent" items that "identif[y] an individual."  751 F.3d at 834.

Having injected confusion into the DPPA with an extra-textual construction, Plaintiffs address their dilemma by arguing that the "totality of the published data identifies them" (p. 6). This answer only compounds the problem by conflating information obtained from CPD through FOIA (names and images) with information allegedly supplied by state agencies (hair and eye colors, weights, and approximate ages).  Plaintiffs' proposition that two legal halves might combine to create an illegal whole is unprecedented.  If the Sun-Times lawfully obtained names through FOIA and non-personal information from the Secretary of State, then it is entitled to publish the facts in any combination.

Nitpicking, Plaintiffs speculate that, notwithstanding the Attorney General's ruling that CPD must disclose their names under FOIA (Doc. 4-2, p. 90), their middle initials were provided by the DMV.  Their Complaint, however, repeatedly admits that their "names" were obtained through FOIA while their purportedly top-secret middle

---

[2] Plaintiffs' suggestion that the Supreme Court endorsed a broad definition of personal information in *Reno v. Condon*, 528 U.S. 141 (2000) is inapposite.  *Reno* was a Commerce Clause case that had nothing to do with the reach of § 2725(3).

initials are published *on the City's website*.[3]  R. Doc. 4-1, pp. 5-6.  In any case, § 2725(3)'s reference to "names" argues that *initials* alone do not constitute "personal information."

Illinois does not have secret police.  Even Plaintiffs acknowledge that their duties place them into contact with the public, including criminals who may observe (and record) their appearances.  Plaintiffs' Brief, p. 16.  At best, Plaintiffs' hypotheticals suggest that some descriptive traits somehow might *aid* in confirming a known identity – *e.g.*, narrowing White Pages results for a name based on approximate ages.  Farfetched, but even then the usefulness of secondary detail is inherently dependent on possession of a name, phone number, or address because telephone directories do not list individuals by their hair color or weight.[4]

The government, on the other hand, concedes that the "Sun-Times is correct that 'no plaintiff has explained how anyone could identify him by hair color or weight.'" Government Brief, p. 12.  The government also inadvertently reinforces the Sun-Times' broader point by asserting that "a person's exact weight and age cannot be readily ascertained from casual physical inspection."  *Id*.  If so, potential stalkers would be better off relying on their own observations than on dated motor vehicle records.

---

[3]http://www.cityofchicago.org/city/en/depts/dhr/dataset/current_employeenamessalariesa ndpositiontitles.html (last visited Sept. 5, 2014).

[4] The President of the Fraternal Order of Police expressed no concerns about descriptive traits when testifying for the DPPA.  Instead, he referenced "the ability of defendants, that they had helped prosecute, to surveil them at their place of employment and get their license plate number, and in turn trace that number through the State Division of Motor Vehicles to get their home addresses."  *Protecting Driver Privacy: Testimony of Donald L. Cahill Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 1994 WL 212833 (Feb. 3, 1994). This hypothetical actually *is* consistent with the congressional decision to specify unique photographs, names, addresses, and license plate numbers while omitting shared features.

Unable to agree with Plaintiffs that their safety is at risk, the government tries a different angle, submitting that some information expressly enumerated in § 2725(3), such as medical and disability information, also may not easily identify individuals. From this, it argues, that Congress meant "identifies an individual" in some "more general sense." p. 12. A "more general sense," however, would strip the phrase of any discernable meaning and would suggest that § 2725(3) is even *more* mutable and internally inconsistent than Plaintiffs propose, so that no reporter could reliably ascertain its scope. More likely rationales are that medical and disability records are uniformly considered private and may *include* enumerated "personal information," such as names and addresses.

Of course, none of the privacy concerns implicated by medical conditions carry over with respect to publicly available, readily observable, and objectively benign physical traits of public officials. *Nat'l Ass'n Of Criminal Def. Lawyers v. Chicago Police Dept.*, 399 Ill. App. 3d 1, 13 (1st Dist. 2010) ("the degree of invasion of personal privacy is insignificant" in lineup photos of police officers). "All laws must be clear and precise enough to give a person of ordinary intelligence fair notice about what is required of him." *Wisconsin Right to Life*, 751 F.3d at 835. Yet the government does not explain how citizens could reasonably infer from § 2725(3)'s express inclusion of disability records that Congress impliedly intended to reach eye color as well.

Reaching even farther afield from the District Court, the Government next cites the DPPA's secondary purpose to regulate direct marketers to infer (p. 14) "there is no basis for suggesting that Congress would have wanted" direct marketers to have access

to ages and weights.   Again, the "basis" is that Congress did not say so.  Instead of conceiving new offenses, courts should presume that there is no basis to impute to Congress an intention to criminalize conduct that it chose to omit from the statute it enacted.  *Wiltberger*, 18 U.S. at 95-96 ("It is the legislature, not the Court, which is to define a crime . . . To determine that a case is within the intention of a statute, its language must authorize us to say so."); compare *Skilling*, 561 U.S. at 405-09.  Like the citizenry, no court should have to guess – particularly without legislative guidance – what Congress "would have wanted." If Congress wanted to extend the DPPA's prohibition on "disclosure" of personal information to a newspaper's publication of public officials' heights, hair colors, *etc.*, it expressed the desire with "a peculiar choice of language and in an unusually backhanded manner."  *Williams*, 458 U.S. at 287.  In any event, nobody in this case contends that anyone used information for direct marketing and, as discussed *infra*, the Government's admission that it would apply prohibitions aimed at direct marketers to a newspaper's investigative reporting effectively concedes that the statute is not narrowly tailored.

Finally, even if one might accept that the Lineup Story included "personal information, for reasons discussed *infra*, at IB, no reporter could expect that § 2724(a)'s cause of action for "disclos[ure]" or "use" of personal information would extend to publication by a newspaper. *New York Times Co. v. United States,* 403 U.S. 713, 720 (1971) (Douglas, J., concurring) (statute prohibiting parties in possession of classified information from "willfully communicat[ing]" the information did not encompass publication by newspaper because relevant provision did not use the word "publish").

Even crediting a flexible reading of § 2725(3), the void for vagueness doctrine does not permit the DPPA to penalize news reporting as a "disclosure."

### B. If the Sun-Times Published "Personal Information," the Reporting was a "Permissible Use"

If the Sun-Times had actually published "personal information," the disclosure nevertheless would have qualified as a permissible use under State law – to which the DPPA defers. See 18 U.S.C. § 2721(b)(14) (permissible use if "specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety").  News reporting with respect to law enforcement is unquestionably a matter of public safety.  *Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir. 1990) ("It would be difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety."); *Shefcik v. Vill. of Calumet Park*, 532 F. Supp. 2d 965, 981 (N.D. Ill. 2007) (complaints regarding police manpower reduction raised issues of "public safety" and "public concern").

Plaintiffs, because they disagree with the Lineup Story's premise, counter that the Sun-Times was not engaged in "newsgathering."  This notion is fundamentally totalitarian as it affords government a convenient excuse to suppress civil rights. Speech protections exist not to coddle public officials but to *foster* criticism in the face of official retaliation and censorship.   Any "use" that publicizes official malfeasance, particularly in a politically charged homicide investigation, is a "core" function of the press authorized by the Constitution and that of the State of Illinois (Ill. Const. art. I, § 4).  See also 735 ILCS 110/5 (proclaiming State public policy in favor of open discussion

of law enforcement affairs).  Consistent with constitutional law and public policy, the Illinois Vehicle Code exempts newsgathering from prohibitions on disclosure of "personally identifying information."  625 ILCS 5/2-123(f-5)(12) (exempting "use by members of the news media . . . for the purpose of newsgathering when the request relates to the operation of a motor vehicle or public safety").  Thus, the Lineup Story was expressly permitted under § 2721(b)(14).

The government ignores § 2721(b)(14) entirely, leaving Plaintiffs to incorrectly claim the argument was not raised below.  Prior to the *Senne en banc* decision, the Sun-Times may have placed its primary reliance on the plain text of § 2725(3), but it also addressed "permissible use."  Cf. R. Doc. 4-2, pp. 50-51, 121-22.  Regardless, the Court should ignore such delaying tactics. When faced with potential infirmities, courts must "independently inquire whether there is another interpretation, not raising these serious constitutional concerns, that may fairly be ascribed."  *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 577 (1988).

### C. The Court Should Construe the DPPA to Avoid Conflict with the First Amendment

The government apparently contends that the doctrine of constitutional avoidance is applicable only where it is apparent that Congress intentionally drafted around foreseen constitutional defects.  Government Brief, p. 16. Predictably, this approach would arrogate impermissible discretion to the executive branch. Cf. *Mattivi v. Russell*, No. CIV.A. 01-WM-533(BNB, 2002 WL 31949898 (D. Colo. Aug. 2, 2002) (construing DPPA's definition of "motor vehicle record" in defendant's favor to avoid

constitutional questions). To the contrary, Courts *presume* Congress did not intend to circumvent the Constitution and "construe the statute to avoid [constitutional] problems unless such construction is plainly contrary to the intent of Congress." *DeBartolo*, 485 U.S. at 575. See also *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994) ("we do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution as construed by this Court").

Significantly, the government's own authority, *Clark v. Martinez,* 543 U.S. 371, 378 (2005), endorsed the doctrine of constitutional avoidance by construing an immigration statute in conformance with *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). The Supreme Court "read an implicit limitation" into the law to avoid the unconstitutional potential for indefinite detention of aliens because "if Congress had meant to authorize the long-term detention of unremoveable aliens, it certainly could have spoken in clearer terms." *Id.* at 697. Cf. *X-Citement*, 513 U.S. at 70 (declining to "follow the most grammatical reading of the statute" so as to avoid constitutional concerns).

In sum, this Court should construe the DPPA to exclude non-enumerated characteristics from its definition of "personal information," and to include newsgathering as a permissible use because this construction is (1) the only reasonable reading of the text, (2) the only reading that saves the DPPA from impermissible vagueness and overbreadth, and (3) avoids the need to confront the First Amendment issues created by Plaintiffs' extra-textual interpretation. *Jones v. United States*, 529 U.S. 848, 857-58 (2000) (when a statute is susceptible to one construction that raises

Constitutional problems and one that does not, "the Court's duty is to adopt the latter").

## II.    Plaintiff's Construction of the DPPA Would Render it Unconstitutional

### A.  The Sun-Times Reported on Fundamental Matters of Public Concern

Judicial determinations with respect to matters of "public concern" must "accord broad protection to speech to ensure that courts themselves do not become inadvertent censors." *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011) (First Amendment protects even hateful signs at military funerals because they "relate[] to broad issues of interest to society at large").  Thus, Plaintiffs' rationale for CPD stacking the Lineup is irrelevant to First Amendment protection for the Lineup Story.[5]  Equally wrongheaded is their suggestion that police officers participating in a homicide lineup are not "public figures."  *Reed v. Nw. Publ'g Co.*, 124 Ill. 2d 495, 511 (1988) (ordinary beat police officers are public officials).  It is therefore absurd for Plaintiffs to insinuate that press reports are outside the scope of the First Amendment after the reports prompted the appointment of a Special Prosecutor to investigate police favoritism in a homicide case and culminated in a long delayed guilty plea from the mayor of Chicago's nephew.

Plaintiffs' approach would "empower a majority to silence dissidents simply as a matter of personal predilections."  *Cohen v. California*, 403 U.S. 15, 21 (1971) (First Amendment did not allow application of state statute to punish individual who wore

---

[5] Plaintiffs' fundamental misapprehensions about the First Amendment are exemplified by their repeated suggestion that selling newspapers subtracts from constitutional protections.  "It is of course no matter that the dissemination takes place under commercial auspices."  *Smith v. People of the State of Cal.*, 361 U.S. 147, 150 (1959) (First Amendment required reversal of conviction of bookseller under ordinance); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964).

"Fuck the Draft" jacket in the presence of children). The First Amendment does not depend on police endorsement of news coverage as fair and appropriate, just as the *Snyder* Court did not endorse the Westboro Baptist Church picket slogans (*e.g.*, "Thank God For Dead Soldiers").  Rather, *Snyder* teaches that the inquiry is whether the speech "can be fairly considered as *relating to* any matter of political, social, or other concern to the community" or " is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Snyder*, 131 S. Ct. at 1216 (emphasis added).[6]  A report into whether local government covered up for the Mayor's nephew after he killed someone and fled the scene undoubtedly qualifies.

Finally, Plaintiffs would play editor by suggesting that the Sun-Times could have illustrated their resemblance to the Mayor's nephew by publishing only the FOIA'ed photographs.  They are compelled to acknowledge, however, that newspapers are entitled to the "exercise of editorial control and judgment" with respect to "treatment of public issues and public officials – whether fair or unfair."  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  "Where enforcement of the Act would interfere with a newspaper publisher's absolute discretion to determine the contents of [its] newspaper[], the statute must yield." *Ampersand Publ'g, LLC v. NLRB*, 702 F.3d 51, 56 (D.C. Cir. 2012) (internal citations omitted).

---

[6] Plaintiffs misleadingly cite *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974) to suggest that the Sun-Times' reporting is not "speech that matters."  The full quote is "The First Amendment requires that we protect some falsehood in order to protect speech that matters." *Id.* Neither Plaintiffs' nor the Fraternal Order of Police's various lawsuits to censor the Sun-Times ever contended that the reports were false, let alone defamatory.

**B. The First Amendment Rights to Both Access and Publication Forbid Plaintiffs' Proposed Application of the DPPA**

To defuse First Amendment protection for the Lineup Story, the Response Briefs heavily rely on the Court's entirely inapplicable opinion in *Travis v. Reno*, 163 F.3d 1000 (7th Cir. 1998). Yet *Travis* had nothing to do with the scope of the DPPA's definition of "personal information" or whether the press can be punished and censored after publishing truthful information provided by the Secretary of State. Rather, *Travis* held that the plaintiffs lacked standing to preemptively challenge the DPPA's constitutionality by suing the government before it even denies access to a record.[7] *Id.* at 1007. Ultimately, the District Court itself backed away from Plaintiffs' interpretation of *Travis* in light of *ACLU*. A027-28.

That newspapers cannot petition for advisory opinions does not mean they can be subjected to criminal and civil liability for publishing information *provided* by government officials. Instead, "where the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release." *The Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989) (First Amendment precluded punishing newspaper for obtaining and publishing information in violation of criminal statute). Whether the Florida Star newspaper could have sued for access to police reports identifying sexual assault victims did not factor into the Supreme Court's determination that, once government officials provided such access, the First

---

[7] Moreover, Travis did not "exclude the possibility that some particular record in a drivers-license system may in the future be deemed constitutionally exempt from the Act," but passed on the question because "[w]e do not have a demand for a particular record that would put the constitutional issue in context." 163 F.3d at 1007.

Amendment did not allow civil sanctions against the paper for printing the reports'

contents. *See also Landmark Commc'ns, Inc. v. Virginia,* 435 U.S. 829, 837 (1978) (press

could not be punished under criminal statute for divulging proceedings of judiciary

inquiry because the right of the press to publish confidential materials it obtains is

distinct from whether there is a "constitutionally compelled right of access for the press

to those proceedings"); *Oklahoma Publ'g Co. v. Dist. Ct. In & For Okla. Cnty.,* 430 U.S. 308,

311 (1977) (by allowing press to attend closed juvenile hearing in violation of statute,

judge and prosecutor implicitly consented to lawfulness of attendance and reporting

information disclosed at the hearing); *Cox Broad. Corp. v. Cohn,* 420 U.S. 469, 471 (1975)

(reporter could not be punished for printing name of rape victim "which was publicly

revealed in connection with the prosecution of the crime").

Plaintiffs would disagree with the District Court and suggest *Travis* intended to

override the Supreme Court's pronouncement over 60 years ago that the First

Amendment "embraces the right to distribute literature . . . and necessarily protects the

right to receive it." *Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143 (1943).  See also

*Stanley v. Georgia,* 394 U.S. 557, 564 (1969) ("It is now well established that the

Constitution protects the right to receive information and ideas."); *First Nat'l Bank of

Boston v. Bellotti,* 435 U.S. 765, 806 (1978) ("the right to hear or receive information . . .

protect[s] the interchange of ideas"); A 027-29.

If *Travis* did stand for the proposition that the First Amendment is unconcerned

with access to information – which it did not – then it has been repeatedly overruled by

this Court and the Supreme Court.  *ACLU,* 679 F.3d at 597 (First Amendment

"prohibit[s] government from limiting the stock of information from which members of the public may draw.") (internal quotations omitted); *Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001) (illegally intercepted cell phone conversation); see also *Weinberg v. City of Chicago,* 310 F.3d 1029, 1046 (7th Cir. 2002) (restrictions on book peddling).  It is well-established that "the First Amendment protects the right to gather information about what public officials do on public property."  *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

Plaintiffs next artificially narrow this Court's more recent and pertinent *ACLU* case, by focusing exclusively on its observation that recordings are a "common" medium of expression.  *ACLU*, however, invalidated the eavesdropping law *both* because it impinged on a common medium of expression *and* because it chilled newsgathering.  679 F.3d at 601.  The immateriality of Plaintiffs' distinction is further demonstrated by the amicus brief, joined by eight prominent news organizations, evidencing that the press "commonly" uses DMV information to support important investigative reporting.  Brief of Amicus Curiae in Support of Appellant Sun-Times Media, LLC and Reversal, pp. 8-11 (Aug. 6, 2014).  Regardless, this Court has previously cautioned that newsgathering protection is *not* confined to "commonly used" methods.  *Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1355 (7th Cir. 1995) (First Amendment protects journalists even when they employ "surreptitious, confrontational, unscrupulous and ungentlemanly" investigatory tactics).

Finally, academic distinctions between access and publication miss the point.  Plaintiffs' complaint seeks damages and an injunction based on *publication* of the Lineup

Story.  It is important to recognize that, although the DPPA restricts access to personal information, the recipient is not subject to damages unless and until it puts the information to a prohibited use.  *Howard v. Criminal Info. Servs.*, 654 F.3d 887, 891 (9th Cir. 2011) (obtaining DMV records to stockpile information was not actionable absent impermissible use of stockpiled information); *Taylor v. Acxiom Corp.*, 612 F.3d 325 (5th Cir. 2010) (same).  If the Sun-Times had not published the officer's characteristics – assuming they were "personal information" – then the act of "obtaining" the information would not give rise to their claim.  Inescapably, Plaintiffs' case runs head-on into the First Amendment's core guarantees for speech and press rights as well as the "corollary" right of access.  *ACLU*, 679 F.3d at 595.

### C.  The Proposed Application of the DPPA Cannot Withstand any Level of Constitutional Scrutiny

Plaintiffs finally argue that the DPPA's effect on protected speech is only "incidental."  Plaintiffs' Brief, p. 25.  Considering their prayer for relief, this contention defies credibility. The impact of fining and censoring the press for reporting official misconduct is "far from incidental."  *ACLU*, 679 F.3d at 602-03.  "When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play . . . As such, the statute burdens First Amendment rights directly, not incidentally."  *Id.*

Nor is the DPPA a content-neutral "statute of general applicability" when it punishes some speakers and exempts others.  *People v. Jones,* 188 Ill. 2d 352, 362 (1999) (sound amplification statute treating advertising differently than other speech was

content-based); *Sorrell v. IMS Health*, 131 S. Ct. 2653, 2663 (2011) (statute was content-based because it "disfavors marketing, that is, speech with a particular content" and "disfavors specific speakers, namely pharmaceutical manufacturers"). Plaintiffs argue that the DPPA was not enacted "because the government disagreed with the message the personal information conveyed," but "[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 592 (1983) (First Amendment could not tolerate generally applicable ink and paper tax).

The distinction ultimately does not matter, however, because the statute "flunks" even "the more lenient intermediate standard of scrutiny applicable to content-neutral burdens on speech." *ACLU*, 679 F.3d at 586 (statute unconstitutional even though it "may or may not be a law of general applicability."). Plaintiffs acknowledge that, even under reduced scrutiny, the DPPA survives only if "the incidental restriction on First Amendment rights are "no greater than is essential to the furtherance of [a substantial government] interest." (p. 25). Yet the only interests asserted involve conjectural stalkers and the governments' worry that Weight Watchers might send police officers junk mail. Congress must legislate against stalking using "narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." *Sable Commc'ns of Cal. v. FCC,* 492 U.S. 115, 126 (1989). If, as the government suggests, the DPPA's purpose also is to curtail mailbox clutter, it nevertheless must be narrowly tailored so that restrictions on direct marketing cannot suppress news reporting. *United States v. Stevens*, 559 U.S. 460, 481 (2010) (government's

interest in prohibiting "crush videos" and dogfighting images did not justify statute

prohibiting depictions of animal cruelty which could apply to hunting magazines). [8]

Finally, the Response Briefs argue that *Florida Star*, *Bartnicki*, and similar

precedents are inapposite because the press in those cases obtained the information it

published "lawfully."  This case is no different.  As in *Bartnicki*, the Sun-Times' *source* –

state government rather than an illegal wire-tapper – is presumed to have unlawfully

provided information.  *Florida Star*, 491 U.S. at 535 ("highly anomalous" to punish

someone other than the source of reported information). The Sun-Times did not hack

computers but simply published the information provided upon request.  Cf. *New York*

*Times Co.*, 403 U.S. at 720 (Douglas, J., concurring) (prohibition on communicating

confidential government information could not encompass news reports where

Congress did not expressly mention "publication" by press).

If publishing information voluntarily provided by state agencies might be

unlawful, *Bartnicki* recognized that it is a "still-open question" whether the press can

*ever* be sanctioned, even when it participates in unlawful conduct in the course of

legitimate newsgathering.  532 U.S. at 528. This complaint involves the color of a police

officers' hair but the Supreme Court declined to affirmatively impose liability with

---

[8] Plaintiffs also attempt to distinguish *ACLU* by claiming a Fourth Amendment interest in
vehicle records but "this is the very sort of information to which individuals do *not* have a
reasonable expectation of privacy." *Nelson v. Jesson*, CIV. 13-340 RHK/JJK, 2013 WL 5888235 (D.
Minn. Nov. 1, 2013). See also *U.S. v. Miller*, 425 U.S. 435, 443 (1976) ("the Fourth Amendment
does not prohibit the obtaining of information revealed to a third party and conveyed by him to
government authorities, even if the information is revealed on the assumption that it will be
used only for a limited purpose and the confidence placed in the third party will not be
betrayed.").  The government does not assert a constitutional privacy right but nevertheless
argues that a public official's vanity should trump the First Amendment.  Government Brief, p.
21 (suggesting officers "prefer not to broadcast their weights and ages to the world").

wartime national security at stake in *New York Times Co. v. United States*, 403 U.S. 713, 718 (1971). In any event, Plaintiffs' reasoning is circular. If the DPPA may not be constitutionally applied to suppress news reporting, then *nobody* acted unlawfully. *People v. Melongo*, 2014 IL 114852, ¶ 35 ("Because we have held that the statutory provision criminalizing defendant's recording of the three conversations is unconstitutional on its face, she is in the position of an innocent party who is subject to a 'naked prohibition against disclosure.'").

## III.     Plaintiffs' Proposed Injunctive Relief is the Essence of Censorship

The government, tellingly, avoids arguing for Plaintiffs' prayer for an injunction compelling the Sun-Times to de-publish its reporting on police misconduct. Even Plaintiffs try to duck the question by claiming that it is not before the Court because the District Court did not formally "certify" it. But see *Edwardsville Nat'l Bank & Trust Co. v. Marion Labs., Inc.*, 808 F.2d 648, 650–51 (7th Cir. 1987) (district court cannot limit the issues that the court of appeals may address when certifying an order for interlocutory appeal). The District Court, however, correctly viewed the injunction as an important question deserving of this Court's consideration.

"[T]he First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result." *New York Times Co.*, 403 U.S. at 725-26 (Brennan, J., concurring). The *New York Times* case involved the federal government's fear of grave and irreparable injury to the national defense during the Vietnam War while this case involves public officials' speculation that someone might find them in the phonebook. Years have passed since

the Fraternal Order of Police first sued the Sun-Times and no officer has suffered any injury.  With nothing to justify Plaintiffs' "surmise or conjecture," this is not the case for carving out an exception to a "quintessential first-amendment violation." *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).

Finally, Plaintiffs mischaracterize *Near*'s ruling on prior restraints as *dicta*.  To the contrary, *Near* is regarded as the "seminal prior restraint decision," and, like this case, involved restrictions on *continuing* publication.  *Leonardini v. Shell Oil Co.*, 216 Cal. App. 3d 547, 577 (Cal. Ct. App. 1989) (injunction against further publication of report would constitute prior restraint);  see also *Admiral Theatre v. City of Chicago*, 832 F. Supp. 1195, 1205 (N.D. Ill. 1993) ("At least since the seminal First Amendment decision in [*Near*] it has been clear that governmental prohibition of future protected expression based on findings of past or present undesirable conduct is the essence of censorship.'").  Cf. *Weinberg*, 310 F.3d at 1046 (restrictions on further distribution of already published book constituted prior restraint); *Oklahoma Publ'g Co.*, 430 U.S. at 311 (court's order prohibiting further publication of juvenile's name or photograph after several stories including his name and picture had already run constituted prior restraint); *Concerned Citizens for Judicial Fairness, Inc. v. Yacucci*, No. 4D14-2971, 2014 WL 4327916 (Fla. Dist. Ct. App. Sept. 3, 2014) (allowing injunction on further publication of allegedly defamatory website's contents "would be to make courts into censors").

As both the District Court and government perceive, Plaintiffs suffered no personal injury from the truthful and important Lineup Story so that censorship appears to be their true goal.  Indeed it is an unavoidable conclusion that the forbidden,

and therefore veiled, purpose of this campaign of litigation, from Fraternal Order of Police's first motion seeking a common law restraining order in the Illinois courts, always has been to chill aggressive press coverage of Chicago's police officers, both collectively and individually.

## CONCLUSION

For the reasons stated herein, in the Sun-Times' Appellate Brief, and in the amicus brief, the Court should reverse the District Court's orders and hold that the Sun-Times' reporting is permitted by the DPPA, that the Constitution does not permit public officials to use the DPPA as a tool for censorship, and that the First Amendment prohibits injunctions against continuing publication.

Dated:  September 5, 2014                  Respectfully Submitted,

                                           s/  Damon E. Dunn
                                           Damon E. Dunn, Esq.
                                           Seth A. Stern, Esq.
                                           **Funkhouser Vegosen Liebman & Dunn Ltd.**
                                           55 West Monroe Street, Suite 2300
                                           Chicago, Illinois 60603
                                           Telephone:  (312) 701-6800

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7)**

The undersigned counsel of record for the Defendant-Appellant, Sun-Times Media, LLC, furnishes the following in compliance with F.R.A.P. Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P. Rule 32(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is 6,580 words.

Dated:  September 5, 2014                    s/ Damon E. Dunn_____
                                            Damon E. Dunn, Esq. (#06180629)
                                            Seth A. Stern, Esq. (#6300954)
                                            Funkhouser Vegosen Liebman & Dunn Ltd.
                                            55 West Monroe Street, Suite 2300
                                            Chicago, Illinois 60603
                                            Telephone: (312) 701-6800
                                            *Attorneys for Sun-Times Media, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY THAT ON September 5, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/ Damon E. Dunn</u>